STATE OF MINNESOTA          )
                            )ss.   **AFFIDAVIT OF J. MATTHEW SNELL**
COUNTY OF HENNEPIN          )

I, J. Matthew Snell, being first duly sworn, states that the following is true and correct to the best of his knowledge and belief:

1. I am a Special Agent of the Federal Bureau of Investigation, assigned to the Minneapolis Division. I have been a Special Agent with the FBI for over six years. I currently investigate economic crimes, including health care fraud. I am participating in a joint investigation with Special Agent Karen Sweet, U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), and Chief Investigator Kate Morton-Peters, State of Minnesota Medicaid Fraud Control Unit.

2. I make this Affidavit in support of a Complaint for injunctive relief under 18 U.S.C. § 1345. I have not included each and every fact known to me regarding this investigation in this Affidavit, but only those facts relating specifically to determining whether there is probable cause to believe that the Defendants have engaged in a fraud scheme in violation of 18 U.S.C. § 1347 (health care fraud).

3. The statements contained in this Affidavit are based on information I learned through investigation as set forth herein; from my experience and background as an FBI Special Agent; and from other law enforcement officers and State of Minnesota Department of Human Services ("DHS") personnel.

4. The investigation summarized herein pertains to the Universal Home Health Care Agency Corporation, also identified as Universal Home Health Care, Incorporated ("UHHC"), a home health agency ("HHA") that provides Personal Care Assistant ("PCA") and nursing services

to Medicaid recipients, Medicare recipients, and individuals covered by Prepaid Medical Assistance Plans.

5. The investigation summarized herein includes, but is not necessarily limited to, (a) the unlawful billing of Medicaid and private insurance plans by UHHC for services purportedly rendered by PCAs to recipients that were in fact never provided; and (b) the unlawful billing of Medicaid and private insurance plans by UHHC for services purportedly rendered by licensed nurses to recipients that were in fact never provided.

6. Title 18, United States Code, Section 1347, provides that an individual commits health care fraud if he or she knowingly and willfully executes or attempts to execute, in connection with the delivery or payment for health care services, a scheme to defraud any health care benefit program or obtains by false or fraudulent representations money or property owned by or under the custody and control of any health care benefit program. Medicaid is a health care benefit program for purposes of 18 U.S.C. Section 1347.

## BACKGROUND: THE MEDICAID PROGRAM

7. *Nature and Purpose of Medicaid Program.* The federal Medicaid program provides medical care and services to low-income persons ("recipients"), who meet certain income and other eligibility criteria. In the State of Minnesota, the Medicaid program is administered by the Minnesota DHS, which contracts with, or enrolls, health care providers to provide health care goods and services to Medicaid recipients. Health care providers who contract with DHS submit Medicaid claims directly to DHS to receive reimbursement from Medicaid funds for their services.

8. *Providers Given Requirements in Various Ways.* Providers are informed of the requirements governing their participation in the Medicaid program, including billing procedures,

2

through several means, including provider information sessions and written materials. For example, the Minnesota Health Care Programs ("MHCP") Provider Manual explains provider requirements.

    a.    <u>Provider Manual</u>. The MHCP Provider Manual has been available to providers electronically since approximately May 2002, and updates to the manual occur electronically on a continuous basis. In addition, DHS periodically issues bulletins containing information specific to providers enrolled in the Medicaid program.

    b.    <u>Home Health Agencies Included</u>. The Manual provides information specific to each category of health care provider, including Home Health Agencies ("HHAs"). Among the services some HHAs provide to Medicaid recipients are personal care assistant and private duty nursing services.

9.    <u>Personal Care Assistants: One Type of Service Covered by Medicaid</u>. Some Medicaid recipients require assistance with personal care in his or her residence. Personal care services covered by the Medicaid program include such services as bathing, hygiene, dressing, medication reminders, food preparation and clean-up, laundry, weekly grocery shopping, light housekeeping, and one-to-one supervision. Under Medicaid guidelines, personal care assistant services are provided by a personal care assistant ("PCA"), who is employed by the provider for the purpose of providing personal care necessary to maintain an individual in his or her residence.

10.    <u>Private Duty Nursing: A Second Type of Service Covered by Medicaid</u>. Some Medicaid recipients require personal nursing care. Private Duty Nursing ("PDN") agencies supply nursing services to Medicaid recipients. Under Medicaid guidelines, a PDN agency offers professional nursing services to a Medicaid recipient in or outside of the recipient's home. Nursing services are ordered by a physician for a recipient whose illness, physical condition, or mental state

requires more individual and continuous care by a registered nurse ("RN") or a licensed practical nurse ("LPN") than a home health aide or personal care assistant can provide.

11. <u>Authorization for PCA Services</u>. To ensure that PCA services are necessary and appropriate for a given Medicaid recipient, a PCA authorization process is part of the Medicaid program. The requirements include, but are not limited to, the following.

    a. <u>Physician Review and Approval</u>. Prior to January 7, 2010, PCA services were required to be ordered by a physician and reviewed at least annually by a physician. PCA services were not eligible for payment if the services were provided without the Physician's Statement of Need on file with the provider, who was responsible for obtaining the Physician's Statement of Need. Since January 7, 2010, PCA services can be ordered by a Public Health Nurse ("PHN"), who then submits a DHS form, "Communication to a Physician of Personal Care Assistance Services," to the recipient's physician.

    b. <u>Public Health Nurse Assessment</u>. For ongoing PCA services to be reimbursable, a PHN assesses whether the recipient is in need of such services, and then must document in a care plan the services needed and the number of daily hours required to provide those services. Based on this information, DHS prior authorizes the needed units of PCA services and prior authorizes the total number of units of service for a service contract, which is generally for one year. One "unit" of service is fifteen (15) minutes. A provider is not authorized to provide PCA services without a PHN assessment having been completed.

    c. <u>Responsible Party</u>. A responsible party is required for a Medicaid recipient who is not capable of directing his/her own care or who is under eighteen years of age (whether or

not he/she is capable of directing his/her own care). Under most circumstances, a responsible party is not eligible to be his/her child's PCA.

12. <u>Requirements on Providers</u>. Agencies that employ PCAs, RNs, and LPNs to provide services to Medicaid recipients are required to observe rules designed to ensure quality of care and the appropriate and accurate billing of services provided. Those requirements include, but are not limited to, the following.

a. <u>Background Studies</u>. Minnesota law requires background studies be requested on all individuals, including PCAs, RNs, and LPNs, who provide direct care to vulnerable adults and children. Background studies are designed to ensure that individuals working with vulnerable adults and children have not been convicted of a crime or maltreated (either abused or neglected) a child or vulnerable adult. The provider is responsible for requesting background studies on its PCAs, RNs, and LPNs.

b. <u>Time Sheet Documentation</u>. PCAs are required to document on time sheets the following information: date of service, activities of care, the name and signature of the PCA, the name and signature of the recipient or responsible party, and the start and stop times worked. The provider is responsible for receiving and maintaining the time sheets of its PCAs.

c. <u>Supervision by a Qualified Professional</u>. In most circumstances, PCAs must be supervised by a Qualified Professional. A Qualified Professional ("QP") must be a registered nurse, mental health professional, or licensed social worker. A QP is responsible for the supervision of PCA services to the recipient. In most circumstances, the provider is responsible for employing a QP to supervise the PCAs.

d.    <u>Qualified Professional Supervision Documentation</u>. QP supervision of PCA services must be documented in the client charts and includes the date of service, the amount of time, or units of service provided. When QP supervision is required, the provider is responsible for receiving and maintaining documentation of supervision.

e.    <u>Retention of Claims Record and Other Documentation</u>. DHS regulations require providers to retain all records related to claims submitted to Medicaid for at least five years after the initial billing. These records include, but are not limited to: appointment books, financial records, billing records, prior authorizations, care plans and documentation of the services provided. The five-year retention requirement is also set forth in the MHCP Provider Manual.

13.   <u>Billing Procedures</u>. Providers of PCA services are required to follow billing rules designed to ensure the submission of accurate and honest reimbursement claims for services actually provided. The requirements regarding claims submission to DHS are stated in the MHCP Provider Manual. Such rules include, but are not limited to, the following:

a.    <u>Billing for Services Actually Provided</u>. Providers who contract with DHS agree to bill for services actually provided. Claims are submitted electronically to DHS. The provider submits a claim under a recipient's individual identifying number. The claim provides a procedure code, indicating the service, along with the provider's number for direct payment to the provider.

b.    <u>Billing Only After Services Have Been Provided</u>. Claims are submitted to DHS after covered services have been rendered. Providers are not permitted to make reimbursement claims for services purportedly to be provided in the future.

   c. <u>Identifying Treating PCA</u>. Effective May 2006, providers are required to identify the treating PCA provider on claims submitted to DHS for PCA services. The requirement is designed to allow confirmation of who is providing the services to the recipient and that billed services have actually been provided.

   d. <u>Shared Care Billing Rate</u>. The reimbursement rate for PCA services is dependent upon the number of Medicaid recipients to whom the PCA provides services simultaneously. If a PCA provides simultaneous service to more than one recipient, the hourly rate reimbursed for each unit provided each client is adjusted downward to reflect the provision of simultaneous, shared service.

  14. <u>Reimbursement Rates</u>. DHS pays for PCA and QP Supervision of PCA services in fifteen-minute units of time. Currently, DHS pays $3.96 per unit for PCA services, or $15.84 per hour; and $6.96 per unit for QP Supervision of PCA services, or $27.84 per hour. DHS pays $29.56 per hour for LPN one-to-one nursing services, and $39.40 per hour for RN one-to-one nursing services. These rates have been in effect since July 1, 2009, and are adjusted periodically by DHS.

  15. UHHC is enrolled in Medicaid as a "Class A" - Professional Home Care Agency that provides PDN services and is reimbursed by DHS, utilizing Medicaid funds. Class A licenses are issued by the Minnesota Department of Health and are required in order to provide PDN services to Medicaid recipients. Additionally, UHHC is a Medicare Certified Home Health Agency that provides in home care services to Medicare recipients, including nursing, physical therapy, speech therapy, respiratory therapy, occupational therapy, nutritional services, medical social services, and home health aide tasks.

16. <u>Prepaid Medical Assistance Program ("PMAP")</u>. PMAP is a health care program that pays for medical services for low-income families, children, pregnant women, and people with disabilities in Minnesota. Health care organizations, such as Blue Cross Blue Shield of Minnesota ("BCBSMN"), Medica Health Plans ("Medica"), and UCare Minnesota ("UCare") contract with DHS to provide health care services to Medicaid recipients on a managed care basis. The health care organizations have contracted with health care providers to provide medical care to Medicaid managed care recipients. Under this arrangement, the health care providers submit claims to the health care organization, rather than DHS, for the services provided to Medicaid recipients.

## INVESTIGATION

### UHHC; Ownership and Control of UHHC

17. UHHC is registered with the Minnesota Secretary of State's Office as an active business under the business name Universal Home Health Care Agency Corporation, with an original date of filing of August 4, 2003. Shukri Adan ("Adan") is identified as the CEO.

18. On or about November 17, 2003, Adan signed a Minnesota Department of Human Services Provider Agreement which was submitted to DHS, identifying Adan as the President of UHHC. By signing the document, Adan agreed "To maintain records that fully disclose the extent of services provided to individuals under these programs...", and "To assume full responsibility for the accuracy of claims submitted to the Department of Human Services."

19. On or about November 17, 2003, Mustafa Mussa ("Mussa"), husband of Adan, signed a Minnesota Department of Human Services Provider Agreement which was submitted to DHS, identifying Mussa as the Director of UHHC. By signing the document, Mussa agreed "To maintain records that fully disclose the extent of services provided to individuals under these programs...",

and "To assume full responsibility for the accuracy of claims submitted to the Department of Human Services."

20. On or about November 17, 2003, Adan and Mussa each signed a Minnesota Department of Health Provider Agreement Addendum (PCA Choice Provider) identifying Adan as an owner and administrator of UHHC, and Mussa as an owner and director of UHHC.

21. On or about February 1, 2006, a Minnesota Health Care Programs Enrollment Application was submitted to DHS that identifies Adan as the 100% owner of UHHC. As part of the enrollment process, Adan signed a Provider Agreement and an Addendum and identified herself as "owner" of UHHC.

22. A DHS Electronic Remittance Advice Request Form dated May 11, 2009, and submitted to DHS by UHHC was signed by Mussa as a Minnesota Health Care Program Provider.

23. A DHS Disclosure of Ownership and Control Interest Statement for Participating Providers dated November 2, 2009, identifies Adan as 100% owner of UHHC; Mussa as 0% owner and a Managerial Entity of UHHC; and Stephen Rondestvedt as 0% owner, Managerial Entity, and Administrator of UHHC.

**Complaint Received Regarding UHHC**

24. On or about September 29, 2009, the Minnesota Department of Human Services' Surveillance and Integrity Review Section ("SIRS") received a complaint from a former UHHC employee, whose identity is known to me, regarding fraudulent activity being conducted by UHHC. The allegations in the complaint included, in part, the assertion that claims were submitted by and through UHHC for PCA services that were not provided, including claims for patients who were traveling out of the country.

### **Investigation of UHHC Billing Practices**

25.     Upon review of the information provided in the complaint, SIRS referred the matter for additional investigation to Minnesota's Medicaid Fraud Control Unit ("MFCU"). I joined MFCU, along with HHS-OIG in a joint investigation of the billing practices of UHHC.

26.     The investigation included, but has not been limited to, a comparison of state employment records submitted by UHHC with the record of claims submitted to DHS for services purported rendered by UHHC employees, as well as review of several individual clients to determine whether unlawful billing was apparent. The results of those investigative steps are outlined below.

### **Review of State Employment Records and UHHC Claims**

27.     The State of Minnesota Department of Employment and Economic Development ("DEED") receives employment information from Minnesota companies on a quarterly basis that includes employee names, Social Security numbers, how many hours each worked, and how much they were paid for the quarter. I obtained DEED records for several PCA employees of UHHC, and the employee work hours reported to DEED by UHHC were compared to the total hours UHHC billed to DHS (and reimbursed by DHS) for each PCA employee of UHHC for calendar years 2007-2009.

28.     The comparison of DEED records to claims submitted and reimbursed revealed many instances where the number of hours purportedly worked by PCAs working for UHHC as reported by UHHC to DHS far exceeded the number of hours worked by that employee as reported by UHHC to DEED:

## Claims for 2007

| Initials of UHHC Employee (Full name known to me) | Total Work Hours for Employee Reported to DHS by UHHC (and Paid by DHS) | UHHC Work Hours for Employee Reported to DEED by UHHC | Overbill based on $15.61 per hour |
|---|---|---|---|
| EWJ | 4,194.3 | 1,781 | $37,672 |
| RRC | 3,883 | 1,112 | $43,255 |
| LG | 3,451.25 | 2,127 | $20,672 |
| RGV | 2,793 | 518 | $35,513 |
| CMM | 1,869.75 | 0 | $29,187 |
| AEW | 2,516 | 1,505 | $15,782 |
| AJW | 1,851 | 1,546 | $4,761 |
| OAI | 2,920 | 2,396 | $8,180 |
| IAG | 2,840.75 | 534 | $36,008 |
| KMYK | 2,669.75 | 913 | $27,423 |
| ZAY | 2,069.75 | 1,225 | $13,187 |
| SAS | 2,164 | 1,959 | $3,200 |
| NMA | 1,992 | 0 | $31,095 |
| AOA | 1,975.25 | 1,911 | $1,003 |
| LM | 1,777.25 | 925 | $13,304 |
| DDB | 1,802.25 | 435 | $21,343 |
| AMA | 2,172.75 | 1,516 | $10,252 |
| MBN | 1,843.75 | 961 | $13,780 |
| CAC | 1,497.25 | 1,047 | $7,028 |
| AME | 1,536 | 732 | $12,550 |
| CNM | 1,380 | 1,363 | $265 |

| Initials of UHHC Employee (Full name known to me) | Total Work Hours for Employee Reported to DHS by UHHC (and Paid by DHS) | UHHC Work Hours for Employee Reported to DEED by UHHC | Overbill based on $15.61 per hour |
|---|---|---|---|
| DMB | 1,376.75 | 74 | $20,336 |
| SN | 947.25 | 0 | $14,787 |
| HLT | 1,860 | 1,224 | $9,928 |
| NAH | 765.5 | 601 | $2,568 |
| KCO | 828 | 491 | $5,261 |
| SDW | 513.5 | 173 | $5,315 |
|  |  |  | $443,670.61 |

**Claims for 2008**

| Initials of UHHC Employee (Full name known to me) | Total Work Hours for Employee Reported to DHS by UHHC (and Paid by DHS) | UHHC Work Hours for Employee Reported to DEED by UHHC | Overbill based on $15.61 per hour |
|---|---|---|---|
| RRC | 6,243.25 | 1,071 | $82,653 |
| TTA | 2,925.25 | 2,702 | $3,568 |
| LG | 3,109.5 | 2,273 | $13,367 |
| CNM | 2,712.5 | 2,159 | $8,845 |
| HLT | 2,974 | 2,244 | $11,665 |
| MWH | 2,707 | 0 | $43,258 |
| MBN | 2,420.75 | 714 | 27,274 |

| | | | |
|---|---|---|---|
| KJW | 2,471.25 | 1,734 | $11,781 |
| SMT | 2,178.25 | 1,833 | $5,517 |
| DAO | 2,384.75 | 1,763 | $9,936 |
| AMA | 2,239.5 | 1,328 | $14,566 |
| AJW | 1,700.25 | 1,123 | $9,224 |
| SDW | 1,524.5 | 763 | $12,169 |
| KMYK | 1,303.5 | 893 | $6,560 |
| NAH | 1,053 | 0 | $16,827 |
| RNS | 1,274 | 1,092 | $2,908 |
| CAC | 1,137 | 891 | $3,931 |
| ZAY | 1,097.25 | 635 | $7,387 |
| SN | 890.5 | 0 | $14,230 |
| IAG | 723 | 0 | $11,554 |
| DMB | 647 | 0 | $10,339 |
| NMA | 517.5 | 0 | $8,270 |
| AME | 360 | 0 | $5,753 |
| | | | $341,597.61 |

## Claims for 2009

| Initials of UHHC Employee (Full name known to me) | Total Work Hours for Employee Reported to DHS by UHHC (and Paid by DHS) | UHHC Work Hours for Employee Reported to DEED by UHHC | Overbill based on $15.61 per hour |
|---|---|---|---|
| LG | 3,249 | 2,419 | $13,396 |
| MBN | 2,282.75 | 602 | $27,127 |

| | | | |
|---|---|---|---|
| CLC | 2,275 | 2,010 | $4,277 |
| RRC | 2,091.5 | 378 | $27,656 |
| TIC | 2,020.75 | 1,904 | $1,884 |
| RNS | 1,644.5 | 1,456 | $3,042 |
| AMA | 1,922.25 | 1,344 | $9,333 |
| WUH | 959 | 432 | $8,506 |
| SG | 930 | 672 | $4,164 |
| MMA | 267.75 | 210 | $932 |
| LM | 210.25 | 56 | 2,490 |
| KMYK | 202.5 | 0 | $3,268 |
| | | | 106,090.61 |

### Sample of Claims Made as to Individual UHHC Clients

29. In addition to the review of DEED hours and claims reimbursed for UHHC PCAs as set forth above, the investigation has included review of claims submitted as to several individual clients of UHHC. That review has revealed examples of claims submitted for services not actually rendered.

30. <u>Claims submitted for services purportedly rendered when client was out of the country</u>. Claims were submitted by UHHC resulting in payments totaling $3,582.00 from DHS for reimbursement of PCA services allegedly provided to recipient T.K. by PCA H.M., whose identities are known to me. The period for which the claims were submitted was from February 11, 2008, to April 10, 2008. In addition to the claims for PCA services, a claim was submitted for a two-hour nurse visit on March 25, 2008, resulting in payment of $56.00. A review of U.S. Customs and Border Protection travel records shows recipient T.K. departed the United States on March 17, 2008,

and returned to the United States on April 10, 2008, and PCA H.M. departed the United States on February 11, 2008, returning to the United States on April 9, 2008.

31. <u>Claims submitted for services purportedly rendered when client was inpatient at a hospital or deceased</u>.

a. Claims were submitted by UHHC to UCare resulting in payments totaling $324.19 for reimbursement of PCA services allegedly provided to recipient M.M.2, whose identity is known to me, for the period November 2, 2009 to November 5, 2009. A review of UCare claims shows recipient M.M.2 was admitted to an area hospital as an inpatient for the period November 1, 2009, to November 6, 2009. Another claim for $70.75 was submitted for reimbursement of in home care services by an RN for recipient M.M.2 on November 3, 2009, during the time the recipient was admitted to an area hospital.

b. Similarly, claims were submitted by UHHC to Medica, a private insurer, in 2008 and 2009 resulting in payments totaling $1,630.92 for reimbursement of 84.75 hours of PCA services and 18 hours of Homemaker Services allegedly provided to seven different recipients during the time the recipients were admitted as inpatients at area hospitals based on my review of relevant hospital records for the seven recipients, all of whose identities are known to me.

c. Similarly, a review of claims submitted by UHHC to Blue Cross Blue Shield of Minnesota, a private insurer, was conducted for the period January 8, 2009, to November 20, 2009. The review identified payment of $2,938.28 in claims for PCA services provided to four recipients for days when the recipients were admitted as inpatients to area hospitals based on my review of relevant hospital records for the four recipients, all of whose identities are known to me.

    d.  Claims for $779.52 were submitted by UHHC to UCare for reimbursement of PCA services for dates which followed patient M.M.2's death, and a claim for $72.62 was submitted by UHHC for an in home nursing care visit by an RN which followed M.M.2's death. The claims were denied by UCare and were not paid.

  32. <u>Claims submitted for services purportedly rendered where PCA states he/she never provided any services</u>.

    a.  Claims were submitted by UHHC to DHS for reimbursement of PCA services allegedly provided by PCA W.A., whose identity is known to me, to thirteen different recipients (including M.M.2), whose identities are known to me, for dates of service in 2007, 2008, and 2009. The claims requested reimbursement of over $124,000, resulting in payments to UHHC in excess of $81,000. I interviewed PCA W.A., who stated he/she worked as an interpreter for UHHC, and also provided PCA services to one recipient for a period of approximately seven days in 2008. PCA W.A. stated he/she did not provide PCA services to any of the thirteen individuals represented in the claims.

    b.  Claims were submitted by UHHC to UCare for reimbursement of PCA services allegedly provided by PCA W.A., (the same PCA identified in paragraph 36.a), for the period October 1, 2008 to November 5, 2009. I interviewed PCA W.A., who stated that he/she did not provide any PCA services for this period, which resulted in a reimbursement to UHHC totaling approximately $31,000.

  33. <u>Submission by UHHC of Multiple Versions of Timecards</u>

    a.  In June 2010, SIRS received a complaint from the owner of a home health care agency other than UHHC stating that claims were being denied for a PCA employee with the

initials K.H., whose identity is known to me. SIRS determined that the claims were being denied because UHHC had already claimed the maximum allowable PCA hours for K.H.

      b.     In June 2010, SIRS twice requested copies of K.H.'s timecards from UHHC to investigate the hours purportedly worked by K.H. On June 21, 2010, a SIRS investigator called UHHC and requested the timecards from a female UHHC employee, and on June 23, 2010, a SIRS investigator called and repeated the request to a male UHHC employee.

      c.     SIRS then received two different sets of timecards for K.H. that purported to accurately reflect K.H.'s hours worked for the same time period. One set was faxed by a male UHHC employee on June 23, 2010, and the second set was faxed by a female UHHC employee on June 25, 2010. A comparison of the two sets of timecards revealed differences included variance in signature dates, variance in whether the timecard was signed or unsigned; and variance in recorded times "in and out" for K.H. for the same day of work. The second set of timecards was faxed to SIRS with a cover sheet identifying the timecards as "original."

## DEFENDANTS' BANKING ACCOUNTS

34.    According to information obtained from Wells Fargo Bank, Universal Home Health Care maintains the following accounts there:

| Account Hoder | Acct Type | Acct Number |
|---|---|---|
| Universal Home Health Care | Choice IV Commercial Checking | 2755722762 |
| Universal Home Health Care | Expanded Business Services | 2755722879 |
| Universal Home Health Care | Expanded Business Services | 8479836879 |

| Universal Health Services Inc. | Expanded Business Services | 3012151175 |

35. According to information obtained from Wells Fargo Bank, Shukri B. Adan and Mustafa Mussa maintain the following accounts there:

| Acct Name | Acct Type | Acct Number |
| --- | --- | --- |
| Shukri B. Adan and Mustafa Mussa | PMA Prime Checking Account | 96369606411 |
| Shukri B. Adan and Mustafa Mussa | High Yield Savings | 9687605148 |

36. I know of no other active bank accounts held in the names of UHHC or its principals. Therefore, it appears that the proceeds of the fraud above described have been deposited into these accounts, and/or transferred between them.

## ONGOING VIOLATION

37. As of the current date, DHS has not suspended payment to UHHC, nor has it suspended or terminated its right to submit claims as a home health care provider. When the search warrant in this matter was executed on November 30, 2010, I personally observed the files of over 90 clients who were insured by Medicaid or other private insurance companies. Since the execution of the search warrant, I have been contacted by representatives of UHHC who requested the return of certain patient files because UHHC continues to claim to provide services for these patients. It appears from this evidence that the fraud described herein is ongoing. The loss suffered through 2009 as a consequence of this fraud to various insurers, public and private, exceeds one million dollars.

## CONCLUSION

38. The above demonstrates that Defendants are engaged in health care fraud resulting in fraudulent claims being submitted to MDHS. MDHS in turn paid the said claims into the account of UHHC, which subsequently transferred those funds to the account of its principals, Shukri B. Adan and Mustafa Mussa. The health care fraud continues to be committed

Further affiant saith not.

*J. Matthew Snell*
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO

before me this 3rd day of December, 2010.

NOTARY PUBLIC

My commission expires: Jan 31, 2015

ANDREA R. KYLLONEN
Notary Public-Minnesota
My Commission Expires Jan 31, 2015